UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTICT OF MICHIGAN
SOUTHERN DIVISION

DONJUARELL YOWELL,

      Plaintiff,                  Civil Action No. 13-10029
                                   Honorable Sean F. Cox
v.                             Magistrate Judge Elizabeth A. Stafford

RAYMOND BOOKER, *et al.*,

      Defendants.
_____/

## REPORT AND RECOMMENDATION TO GRANT
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [R. 83]

## I.    INTRODUCTION

Plaintiff DonJuarell Yowell, a Michigan Department of Corrections

("MDOC") prisoner with a prosthetic leg below the right knee, alleges that

Annetta Simon, Willis Chapman and Raymond Booker were deliberately

indifferent to his serious medical needs in violation of his Eighth

Amendment rights, and that Chapman and Booker violated his First

Amendment rights by transferring him to a different facility in retaliation for

filing grievances.  [R. 76].  Before the Court is defendants' motion for

summary judgment.[1]  [R. 83].  Yowell agrees to dismiss his claims against

Booker.  [R. 84, PgID 1028].  After review of the parties' briefs, the Court

_____

[1] This matter is referred to the undersigned for all pretrial proceedings.

finds that no reasonable juror could find for Yowell on any of his claims, and thus **RECOMMENDS** that defendants' motion for summary judgment [R. 83] be **GRANTED**.

## II.   BACKGROUND

From May 10, 2012 until October 16, 2012, Yowell was housed at MDOC's Ryan Correctional Facility ("RRF"), where Booker was the Warden, Chapman was the Deputy Warden, and Simon was the Acting Health Unit Manager ("AHUM"), [R. 84-25, PgID 1322].  Yowell's deliberate indifference claim relates to the treatment he received for a gel sleeve[2] used for his prosthetic leg, as well as the replacement of a defective prosthetic leg.

On May 17, 2012, Yowell kited[3] about a prosthetic leg supply request, and a nurse scheduled him for a May 24 appointment that was subsequently rescheduled for May 31.  [R. 83-3, PgID 923-24].  After the appointment was canceled due to a mobilization lockdown, Yowell kited again on June 4, and he was scheduled for a June 11 appointment.  [*Id.*,

---

[2] A gel sleeve "rolls up-over [his] stump and is inserted into the [prosthetic] leg locking it into place."  [R. 83-5, PgID 998; R. 83-2, PgID 859-60].  They typically last between three and four months.  [R. 83-2, PgID 861].
[3] A "kite" is a written communication by a prisoner to request services from prison staff, including medical care. *See Peterson v. Foco*, No. 1:09-CV-233, 2010 WL 5058352, at *2 (W.D. Mich. Dec. 6, 2010) (collecting cases).

PgID 925; R. 83-2, PgID 862-64].  Up until this point, Yowell had no contact with Simon or Chapman.  [R. 83-2, PgID 862-63].

On June 5, 2012, Yowell filed a grievance ("Grievance RRF-12-06-434") alleging medical neglect from the healthcare staff, and stating that he needed a replacement gel sleeve for his leg.  [R. 83-4, PgID 995].  On June 11, he saw Vindhya Jayawardena, M.D., and demanded a new sleeve immediately; the doctor informed Yowell that she would have to submit a request for Regional Medical Officer ("RMO") approval.  [R. 83-3, PgID 927-29; R. 83-4, PgID 996].  She submitted the request, and it was approved that day.  [R. 83-3, PgID 930].

On June 19, 2012, Grievance RRF-12-06-434 was assigned to Simon; she responded that Dr. Jayawardena requested and obtained RMO approval for a new gel sleeve on June 11, and that the approval was faxed to Duane Waters Hospital ("DWH") that same day.  [R. 83-4, PgID 996].  Simon also noted that she "[i]nformed [Yowell] that DWH will notify health care when appointment is scheduled for the Gel Sleeve."  [*Id.*].  Responding to the grievance was Simon's first involvement with Yowell.  [R. 83-2, PgID 867].

Yowell kited healthcare on June 23 regarding his sleeve, and he was scheduled for a June 29 appointment with Dr. Jayawardena.  [R. 83-3,

PgID 931].  A nurse met with Yowell and examined his leg the following day after he complained of pain; the exam revealed tenderness, swelling and an open sore one inch wide and one inch long on the inner aspect of his limb, and she issued him crutches to remove pressure and one day of lay-in time.  [*Id.*, PgID 932; R. 83-2, PgID 882].  He kept the crutches for the remainder of his time at RRF.  [R. 83-2, PgID 880].  On June 26, Yowell kited stating that his stump was swollen and bruised, and requesting that healthcare request a sooner off-site appointment with DWH for him to receives his new gel sleeve, but Simon responded that that the prison healthcare did not schedule appointments at DWH, and that DWH would notify healthcare when the appointment is scheduled.  [R. 83-3, PgID 933].

On June 28, 2012, Jamie Campbell, PA, met with Yowell regarding a follow-up of the RMO approval for a new gel sleeve.  [*Id.*, PgID 934].  Yowell reported tenderness and a scant amount of bleeding, and he was concerned that the rubbing of his prosthetic on his stump had caused a wound.  [*Id.*].  Upon examining the stump, Campbell observed a "2mm oval superficial ulcer . . . at lateral aspect of R stump. Overlying skin clean, dry w/o increased erythema, edema, or discharge"; set forth a plan to give the

RMO approval for a gel sleeve to "RN13[4] for further processing"; and ordered wound care dressing for that day along with daily wound care dressing for one week.  [*Id.*, PgID 934-35 (footnote added)].  During a June 29 wound care session, a nurse observed that the wound was healing, with the area measuring .75 inches by .75 inches, and she noted that Yowell's pain scale was 0.  [*Id.*, PgID 936].  Yowell chose not to attend any more wound dressing sessions because he "could do it [him]self."  [R. 83-2, PgID 883].

Following his appointment with Campbell on June 28, 2012, Yowell sent a letter to Booker regarding his gel sleeve, stating that "contrary to Dr. Jayawardena[] and … Simon['s]" prior statements, his gel sleeve had not been ordered and he had not been scheduled for a DWH appointment until his appointment with Campbell earlier that day.  [R. 83-5, PgID 998].  On July 2, Booker's secretary emailed the letter to Simon, indicating that a response was due by July 16.  [*Id.*, PgID 999].  Simon responded that the medical record showed that the RMO approval was granted on June 11, that a healthcare secretary faxed the approval to DWH's Physical Therapy Department that afternoon at 2:37 p.m., and that Campbell and "A/RN13 Ramsey" both reported telling Yowell that the gel sleeve request was

---

[4] It appears that "RN13" is in reference to RN Ramsey.  [*See* R. 83-5, PgID 1000].

processed.  [*Id.*, PgID 1000].  She further noted that, "DWH schedules physical therapy appointments," and concluded that "[a] review of the process revealed timely request, approval and notification to DWH for service.  At this time, awaiting appointment from DWH."  [*Id.*].

On July 12, 2012, Yowell kited healthcare again regarding the gel sleeve, and stating that his stump was sore and swollen.  [R. 83-3, PgID 937].  Simon responded the following day, stating, "The original RMO approval was faxed to D. Smith @ DWH on 06/11/2012.  On 07/03/12 e-mail sent to assess status.  Patient Services @ DWH contacted A/HUM Simon on 07/11/12 requesting to re-fax RMO approval.  Appointment has been scheduled."  [*Id.*].

On July 26, 2012, Yowell had an appointment at DWH with Joe Hunter, an orthoptist, in order to receive a new gel sleeve, but the socket in his prosthetic began falling apart days before the appointment, and Hunter stated that it was under warranty and would be replaced.  [*Id.*, PgID 896, 938; R. 84-11, PgID 1173].  Since Yowell had only had that prosthetic for approximately five months, Hunter said that it was "inherently defective" and that he was "just trying something new and it didn't work."  [R. 83-2, PgID 872; R. 84-11, PgID 1173].  Yowell no longer needed a new gel sleeve – he needed a new prosthetic.

6

Yowell had kept an old prosthetic as a backup and wore it to the appointment with Hunter, but it did not fit him well any longer and was uncomfortable. [R. 83-2, PgID 869-71]. Hunter provided him with a "Durasleeve"[5] for his old prosthetic and said he would replace the socket on his new prosthetic and have it finished in two weeks. [*Id.*, PgID 871; R. 84-11, PgID 1173]. Yowell had no complaints to healthcare upon returning from DWH on July 26. [R. 83-3, PgID 938]. Nor did he have any complaints regarding his prosthetic leg during appointments with PA Campbell on August 1 and August 15; on this latter date, Campbell indicated that Yowell was "negative for gait disturbance." [*Id.*, PgID 939-42].

On August 23, 2012, Yowell kited regarding his prosthetic leg request, and he also sent a letter to Simon asking her to find out from DWH when his new prosthetic would be ready, as it had almost been five weeks since Hunter "vowed to replace the leg within 2 weeks," yet he remained on crutches and was still using the "old inadequate leg." [*Id.*, PgID 943; R. 84-21, PgID 1306]. A nurse saw Yowell on August 31 and told him an appointment would be made in September. [R. 83-3, PgID 944]. Simon called DWH on August 27 to check on the status of his prosthetic, and she

---

[5] "A Durasleeve is different from a gel sleeve." [R. 83-2, PgID 858]. Yowell's old prosthetic was a different type than his new one; he used a Durasleeve with his old leg, and a gel sleeve with his new leg. [*Id.*, PgID 858-60].

7

responded to Yowell on September 7, stating that although she checked with DWH, she could not state the date his prosthesis would be delivered, but that he would be scheduled for an appointment in September once the leg arrived at DWH.  [R. 84-21, PgID 1306].

On August 30, 2012, prior to seeing the nurse on August 31 and receiving Simon's response on September 7, Yowell filed a grievance ("Grievance RRF-12-09-666") regarding not receiving his prosthetic leg back from Hunter yet.  [R. 84-11, PgID 1173].  The grievance was assigned to Nurse Sharon Ramsey as the respondent and Simon as the reviewer. [*Id.*, PgID 1174].  In a September 14 response, Nurse Ramsey stated that Yowell "was scheduled to be seen at DWH orthotic clinic 9/20/12, however, this had to be cancelled due to a change in the process and all Orthotics visits.  Ms. Barrett, the off-site coordinator sent me an email that PA Campbell would be submitting the necessary approval requests to schedule this appointment per Dr. Jayawardena's instructions.  407 needed." [*Id.*, PgID 1174].  On September 17, PA Campbell submitted a 407 consultation request for gel sleeve fitting, noting "407 needed instead not RMO per Mary Beth Foster at DWHC."  [R. 83-3, PgID 945].  At this time, Yowell was still using his old prosthetic, for which he used a Durasleeve – not a gel sleeve.  [R. 83-2, PgID 858-60].  Thus, they were

8

requesting the gel sleeve in anticipation of receiving the new prosthetic back from Hunter.

On September 19, 2012, the outside medical contractor's utilization manager, Harriet Squier, M.D., reviewed and denied the 407 request, indicating that because the gel sleeve "is not custom made for [Yowell]" it is "MDOC procurement" and "do[es] not require a 407.  Please order the item and send to the facility."  [*Id.*, PgID 948-49].  During a September 21 appointment, PA Campbell informed Yowell of the 407 result, and noted that he was negative for gait disturbance.  [R. 83-3, PgID 950-51].

Yowell filed a grievance on October 8 claiming that the 407 request was denied because PA Campbell failed to specify that the gel sleeve was medical, not athletic, equipment ("Grievance RRF-12-10-758").  [R. 83-7, PgID 1007].  On October 16, Simon responded to the grievance stating that she spoke to Campbell, who "agreed to re-submit request explaining that it is custom made for his prosthetic leg."  [*Id.*, PgID 1008].  Campbell submitted the revised 407 request that day, and Dr. Squier approved it on October 17.  [R. 83-3, PgID 960-61, 966-67].

On October 16, 2012, Yowell was transferred from RRF to Oaks Correctional Facility ("Oaks"), per a transfer order that was approved by MDOC Classifications Specialist Robert Gilbert and signed by Chapman.

9

[R. 83-8; R. 83-9, PgID 1012-13].  Yowell was transferred because RRF was transitioning to a parole-violator facility, and all prisoners had to be transferred.  [R. 83-9, PgID 1012].  The intake nurse at Oaks forwarded Yowell's 407 requests to the health information manager.  [R. 83-3, PgID 962].  Yowell met with doctors at Oaks on October 22 and 24, 2012, and per his request a cane was ordered in place of the crutches.  [*Id.*, PgID 964-65, 969].

On October 30, Yowell was transferred to the Reception and Guidance Center ("RGC") for a physical therapy appointment at DWH.  [*Id.*, PgID 900, 970-77].  On October 31, Subrina Aiken, RN, the Clinical Administrative Assistant for the Region III Health Care Administration, provided a Step II response to Grievance RRF-12-09-666, stating that she was able to locate Yowell's "missing prosthetic" that Hunter took on July 26; it "was repaired under warranty, per Joe Hunter at Bio Med Design and will be taken to DWH in the morning."  [R. 84-11, PgID 1176].  However, after inspecting the prosthetic leg the following day, the orthotics clinic indicated that it needed a new gel locking liner and a new foot.  [R. 83-3, PgID 975-76].  Notably, Yowell acknowledges it was Hunter's fault that he did not receive his new prosthetic back at that point; Hunter had failed to do his job and had been fired or replaced.  [R. 83-2, PgID 875].

10

Upon returning to Oaks, Yowell complained about having been transferred to RGC "for no reason," but was informed that the normal process was to house prisoners at RGC while they are awaiting an appointment at DWH.  [R. 83-3, PgID 977].  Yowell responded that he no longer wanted appointments at DWH, which prompted nurses to strongly urge him to reconsider as that position would delay and possibly preclude further treatment, and he changed his mind.  [*Id.*, PgID 978-81].

On December 13, a doctor spoke to the orthoptist, who confirmed that a new prosthesis and two new gel liners were needed; the doctor completed a 407 request for the services.  [*Id.* PgID 982-85].  Yowell was transferred to RGC on January 7, 2013, fit at the orthotics clinic with a new foot and gel liners for his leg on January 11, and then returned to Oaks on January 15.  [*Id.*, PgID 987-93].

Yowell filed this case in January 2013.  On February 26, 2015, he filed the operative amended complaint, in which he alleges Eighth Amendment deliberative indifference claims against Simon, Chapman and Booker, and First Amendment retaliation claims against Chapman and Booker.  [R. 76].  Defendants moved for summary judgment.  [R. 83].

11

Yowell filed a response brief agreeing to drop his claims against Booker, and defendants replied.[6]  [R. 84; R. 89].

## III.   STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that "[t]he Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-57 (1986); *Pittman v. Cuyahoga County Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011).  The party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion, and must identify particular portions of the record that demonstrate the absence of a genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009).  A fact is material if it could affect the outcome of the case based on the governing substantive law. *Liberty Lobby*, 477 U.S. at 248.  A dispute about a material fact is genuine where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

---

[6] Yowell filed two motions to strike affidavits defendants attached to their motion and reply brief.  [R. 85; R. 92].  In a separate order, the Court denied those motions.  [R. 95].

12

If the movant satisfies its burden, the burden shifts to the non-moving party to go beyond the pleadings and set forth specific facts showing a genuine issue for trial. *Celotex*, 477 U.S. at 324; *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001). The opposing party "may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Alexander*, 576 F.3d at 558 (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)). Indeed, "'[t]he failure to present any evidence to counter a well-supported motion for summary judgment alone is grounds for granting the motion.'" *Id.* (quoting *Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009)). "Conclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary judgment." *Id.* at 560 (citing *Lewis v. Philip Morris, Inc.*, 355 F.3d 515, 533 (6th Cir. 2004)). Moreover, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Liberty Lobby*, 477 U.S. at 252.

In deciding a summary judgment motion, the Court must view the factual evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v.*

*Zenith Radio Corp.*, 475 U.S. 574, 587-88(1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).  The Court need only consider the cited materials, but it may consider other evidence in the record.  Fed. R. Civ. P. 56(c)(3).  The Court's function at the summary judgment stage "is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Liberty Lobby*, 477 U.S. at 249.

## IV.   ANALYSIS

### A.   Deliberate Indifference

Yowell argues that he was at Simon's mercy, and that with deliberate indifference, she failed to take reasonable steps to resolve the delay in his receiving a repaired prosthetic leg, forcing him to endure bleeding, swelling and pain.  Yowell claims that Chapman was deliberately indifferent because he ignored letters that Yowell sent him addressing his need for treatment.

The Eighth Amendment's Cruel and Unusual Punishment Clause prohibits prison officials from inflicting "unnecessary and wanton infliction of pain" upon inmates.  *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (internal citations omitted).  "'Deliberate indifference' by prison officials to an inmate's serious medical needs constitutes 'unnecessary and wanton

14

infliction of pain' in violation of the Eight[h] Amendment's prohibition against cruel and unusual punishment."  *Miller v. Calhoun Cty.*, 408 F.3d 803, 812 (6th Cir. 2005) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).

A deliberate indifference claim has an objective and a subjective component.  *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).  The objective component requires a plaintiff to allege that the medical need at issue is "'sufficiently serious.'"  *Id.* at 702-03 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)).  "To satisfy the subjective component, the plaintiff must allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk."  *Comstock*, 273 F.3d at 703.  However, a plaintiff does not have to show that the prison official acted "for the very purpose of causing harm or with knowledge that harm will result."  *Farmer*, 511 U.S. at 835.  Rather, a plaintiff need only show that the official "recklessly disregard[ed]" a substantial risk of serious harm.  *Id.* at 836.

Defendants argue that Yowell cannot establish the subjective or objective components on deliberate indifference because he did not have a serious medical need that required replacement of his medical devices sooner; his temporary use of crutches did not amount to a serious medical

15

need; he cannot show that the delay caused him any serious injury; and he cannot show that they deliberately ignored his medical needs.  Viewing the evidence in the light most favorable to Yowell, the Court finds that he cannot establish the subjective component of deliberate indifference – i.e., that defendants subjectively perceived and recklessly disregarded a substantial risk of serious harm – and thus recommends dismissing his Eighth Amendment claims.

### i.    AHUM Annetta Simon

No reasonable jury could find that Simon recklessly disregarded Yowell's medical needs, as she was consistently responsive to his requests for medical attention and the delay was out of her control.  Yowell acknowledges Simon made efforts on his behalf, including her July 2 response to his letter to Booker, her email to DWH on July 3, and her scheduling of an appointment with an orthoptist on July 11.  He also makes reference to Simon's September 7 response to his August 23 kite, in which she stated that she had contacted DWH on August 27 to check on the status of his prosthetic, and that he would be scheduled for an appointment in September.  [R. 84-21, PgID 1306].  The record also shows that Simon responded to Yowell's June 5 grievance the day it was assigned to her, [R. 83-4, PgID 996]; responded to Yowell's letter to Booker the same day it

16

was forwarded to her, [R. 83-2, PgID 1000]; responded to Yowell's July 12 kite the next day, noting that an appointment had been scheduled, [R. 83-3, PgID 937]; and checked the status of his prosthetic leg on August 27 after receiving his August 23 letter to her, [R. 84-21, PgID 1306].

While the Court is sympathetic with Yowell's frustrations surrounding the delays in treatment, those delays were not within the purview of Simon's duties. Her unit did not provide physical therapy, prosthetic legs, or gel sleeves; those were DWH's responsibilities. [R. 84-25, PgID 1350]. Simon had no control over the operations at DWH beyond sending the orders there and following up to make sure they are received. [*Id.*, PgID 1350-53].[7] Thus, the delay from the approval of Yowell's new gel sleeve to when he was seen by Hunter – June 11 to July 26 — was out of Simon's control. [R. 83-2, PgID 872, 1000; R. 84-11, PgID 1173]. That Yowell's prosthetic began to fall apart days before the July 26 appointment was also out of her control, and until August 23, Simon had no reason to know that Yowell was in need of a new leg. He made no complaints regarding his leg and PA Campbell described him as being "negative for gait disturbance" during appointments in August. [R. 83-3, PgID 939-42]. Simon also had

---

[7] Her unit did provide wound care and medication, [*Id.*, PgID 1350], though Yowell elected to stop attending wound dressing sessions. [R. 83-2, PgID 883].

no control over when the new prosthetic would be ready, and no fault in the

cancellation of his September 20 appointment with DWH due to a change

in DWH procedure.  [R. 84-11, PgID 1174].

Simon was also not responsible for the delay in replacing Yowell's gel

sleeve.  She bore no responsibility for the rejection of the 407 request for a

gel sleeve on September 19, [R. 83-2, PgID 948-49], and, on October 16,

Yowell was transferred, ending Simon's involvement with his treatment.

Even still, Simon submitted a response on October 16 to Yowell's October

8 grievance on the issue regarding his gel sleeve, facilitating PA

Campbell's re-submission of the 407 request with a proper explanation.  [R.

83-7, PgID 1008].  The request was approved the next day.  [R. 83-3, PgID

960-61, 966-67].

These facts demonstrate that Simon was consistently responsive to

Yowell's requests and complaints and that she bore no responsibility for the

delays that Yowell suffered.  No reasonable juror could find that Simon

recklessly disregarded his serious medical needs, and summary judgment

in her favor should be granted.

### ii.   Deputy Warden Willis Chapman

Yowell claims that Warden Chapman was deliberately indifferent

because Chapman ignored three letters that Yowell sent about his need for

treatment.  [*See* R. 84-3, PgID 1088; R. 84-24].  But Chapman's alleged failure to act is not enough to establish liability; Yowell must establish that Chapman participated in, encouraged or implicitly acquiesced in unconstitutional conduct.  *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999).  Yowell's deliberate indifference claim against Chapman should therefore be granted as a matter of law.

## B.    First Amendment Retaliatory Transfer

Yowell alleges that Chapman violated his First Amendment rights by transferring him to Oaks in retaliation for filing grievances.  He claims that when RRF closed, he was one of three prisoners transferred to Oaks while most other prisoners were transferred to Muskegon; that Oaks was too far from DWH; and that Chapman had retaliatory motive in transferring him to Oaks, where they could not meet his medical needs.  [R. 83-2, PgID 876-78].

Chapman contends that he is entitled to summary judgment because Yowell cannot establish all of the elements of retaliatory transfer, and because he failed to exhaust his administrative remedies with regards to this claim.  The Court finds that it is arguable whether Yowell exhausted his administrative remedies; however, because the Court agrees that Yowell

19

cannot establish each element of a First Amendment retaliation claim, summary judgment should be granted on that basis.

Retaliation against a prisoner in response to his or her exercise of a constitutional right violates the Constitution. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (*en banc*). To state a First Amendment retaliation claim, a prisoner must establish that "1) he engaged in protected conduct, 2) the defendant took an adverse action that would deter a person of ordinary firmness from continuing to engage in that conduct, and 3) the adverse action was taken at least in part because of the exercise of the protected conduct." *Siggers-El v. Barlow,* 412 F.3d 693, 699 (6th Cir. 2005).

Here, Yowell has presented insufficient evidence that Chapman took any adverse action against him. Yowell alleges that Chapman transferred him to Oaks in order to retaliate for his grievances. As evidence that Chapman was responsible for his transfer, Yowell points to Chapman's signature on the transfer order and the order's comment stating, "Transfer for wheelchair needs," even though Yowell did not need a wheelchair. [R. 84-12, PgID 1186-87]. But Robin Gilbert, the Classification Specialist at MDOC's Central Office, submitted an affidavit stating that the MDOC transitioned RRF into a parole-violator facility, and that the Central Office

decided where all of the prisoners who had been housed there would be transferred.  [R. 83-9, PgID 1012-13].  She said that all prisoners who were confined to wheelchairs, or relied on crutches or canes were placed on a "wheelchair" list and transferred to Oaks by the Central Office because it could accommodate their needs.  [R. 83-9, PgID 1013].  Consistent with Gilbert's affidavit, Chapman testified by affidavit that he had no discretion regarding where Yowell was transferred and merely signed the already completed transfer order to verify that it had no errors.  [R. 89-4, PgID 1497-98].  In addition, the transfer order itself states that it was approved by "R. Gilbert."  [R. 84-12, PgID 1186].

Yowell argues that the jury will not believe Gilbert's affidavit or the explanation regarding the "wheelchair" classification.  That argument is insufficient, because Yowell "may not 'rely on the hope that the trier of fact will disbelieve'" the defense.  *Alexander*, 576 F.3d at 558 (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).  In light of the lack of evidence that Chapman took an adverse action, summary judgment should be granted in his favor on that claim.

## C.   Qualified Immunity

Defendants also argue that they are entitled to qualified immunity on all of Yowell's claims, as they have violated no clearly established statutory

or constitutional rights.  Because Yowell has presented insufficient evidence to establish any constitutional violations, defendants are entitled to qualified immunity.  *Estate of Carter v. City of Detroit*, 408 F.3d 305, 311 (6th Cir. 2005) (qualified immunity applies when defendant has not violated a clearly established constitutional right).

## V.  CONCLUSION

For the foregoing reasons, the Court **RECOMMENDS** that defendants' motion for summary judgment [R. 83] be **GRANTED**, and the claims against Simon, Chapman, and Booker be **DISMISSED WITH PREJUDICE**.

s/Elizabeth A. Stafford
ELIZABETH A. STAFFORD
United States Magistrate Judge

Dated: August 17, 2016

## NOTICE TO THE PARTIES REGARDING OBJECTIONS

Either party to this action may object to and seek review of this Report and Recommendation, but must act within fourteen days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991)*; United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing objections which raise some issues but

fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). A copy of any objection must be served upon this Magistrate Judge. E.D. Mich. LR 72.1(d)(2).

Each **objection must be labeled** as "Objection #1," "Objection #2," etc., and **must specify** precisely the provision of this Report and Recommendation to which it pertains. Not later than fourteen days after service of objections, **the non-objecting party must file a response** to the objections, specifically addressing each issue raised in the objections in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc. The response must be **concise and proportionate in length and complexity to the objections**, but there is otherwise no page limitation. If the Court determines that any objections are without merit, it may rule without awaiting the response.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on August 17, 2016.

s/Marlena Williams
MARLENA WILLIAMS
Case Manager
